George B. CATMULL and Florence M.
Catmull, Plaintiffs and Respondents,

v.

George T. JOHNSON et al., Defendants
and Appellants.

No. 13927.

Supreme Court of Utah.

Oct. 21, 1975.

Robert G. Pruitt, of Pruitt & Dabney,
Robert M. Anderson, and Jean L. Weaver

of VanCott, Bagley, Cornwall & McCarthy, Salt Lake City, for defendants-appellants.

Richard L. Bird, Jr., of Richards, Bird & Kump, Gregory L. Seal, of Richards, Bird & Kump, Salt Lake City, for plaintiffs-respondents.

MAUGHAN, Justice:

Plaintiffs initiated this action to recover certain royalty payments which they claimed were due and owing pursuant to an agreement between them and defendant Johnson, and which was binding upon the other defendants as successors in interest to Johnson. Upon trial before the court, plaintiffs were granted judgment and they were awarded payments for the years 1971, 1972, and 1973. Defendants appeal therefrom.

On February 28, 1966, plaintiffs conveyed three mining claims to defendant Johnson and his wife. These were situated in Little Cottonwood Canyon, and known as the Free Coinage Claims. This conveyance was expressly made subject to an agreement of the same date between the grantor and grantees, and the terms of the agreement were incorporated by reference in the deed. This agreement provided that Johnson would pay Catmull a percentage of the gross receipts from any ski lift erected upon the land conveyed. The percentages varied according to whether the lift was erected partially or completely on the subject lands, but in no event was the grantor to receive less than two per cent of the gross receipts. The agreement, which was recorded, provided that it was binding upon Johnson's successors in title and that any subequent conveyance of the fee was expressly made subject to the agreement.

Defendant Johnson encountered difficulty in obtaining financing for construction of the ski lift, on property subject to a royalty agreement. On December 18, 1969, plaintiff executed an "Amendment To Agreement" which provided:

AMENDMENT TO AGREEMENT

For valuable consideration, I hereby amend our Agreement of February 28, 1966 to provide that you or any successor in interest may purchase and acquire all of my rights and interests under said Agreement upon payment to me in cash as follows:

If paid on or before July 1, 1970 the total price shall be $17,000.

If paid after July 1, 1970 the total price shall be $21,000.

Plaintiff received a check in the sum of $10 as consideration for execution of this amendment. Subsequently, in May 1970, the Johnsons' interest in the property was conveyed to defendant, Snowbird, Ltd., a Utah limited partnership, which had actual knowledge of the agreement. Financing for the project was obtained in 1970; construction commenced in 1970, and continued in 1971. The operation of the ski lifts started in November and December, 1971, including a lift known as Gad II, which was partially erected across the Free Coinage Claims.

No royalties were tendered or paid to plaintiffs, and no demand was made therefor until May 1973. In April 1973, Johnson contacted plaintiff and inquired whether he would sell his royalty interest for $17,000. Plaintiff refused and stated that circumstances had changed since the amendment was executed—there was now a lift operating on the property. On May 16, 1973, plaintiff sent Johnson a letter stating that he would not sell his interest for any price, and demanding the payments due him under the 1966 agreement. On May 24, 1973, Johnson tendered a draft of $21,000 to plaintiff and demanded an assignment of plaintiff's interest, in accordance with the 1969 amendment to the royalty agreement. Plaintiff refused tender and this action was commenced.

Defendants pleaded that plaintiff's refusal to accept the tendered payment and to deliver the requested assigment constituted

a breach of the 1966 agreement, as amended in 1969; that the agreement was, therefore, no longer binding upon the parties, and plaintiff was not entitled to recover any sum due thereunder. In reply to defendants' answer, plaintiff pleaded that if the 1969 amendment were a valid option, it had expired, or had been withdrawn.

Upon trial to the court, the court ruled that the 1966 agreement was valid and in full force and effect and that defendants were bound thereby. The 1969 amendment was construed as giving Johnson the right for a reasonable length of time to acquire the interest in the royalty at the prices specified. The trial court ruled that between December 1969 and April 1973, more than a reasonable time had elapsed for exercise of the right to purchase the royalty, that conditions in the interim had changed substantially; and that the royalty payable was grossly in excess of the amount forming the basis of price recited in the amendment.

The findings of fact indicated that plaintiff had calculated the price of $21,000 on the representation of Johnson that the royalty could never exceed $100 per month. By 1973, it was apparent to defendants that the royalty would be approximately $300 per month for 1972, and $450 per month for 1973.

The parties also disagreed as to the proper method of calculating the gross receipts attributed to Gad II, since the rides on this lift are not sold separately. The trial court found that it would be reasonable to calculate the royalty by using the same formula used by the Forest Service to determine the use fee for ski lifts on governmental lands.

On appeal, defendants contend that the trial court erred in its conclusion of law in paragraph 3, which stated:

3. The so-called "Amendment to Agreement" of December 18, 1969 lacks the mutuality of a bilateral agreement and gave the First Party the right for a reasonable length of time to acquire the ski royalty involved in this action at the prices specified.

Within the factual framework of this matter, this conclusion correctly construes the amendment of 1969, as an option, i. e., a continuing offer, which must be unconditionally accepted within a reasonable time to create a binding contract.[1] Through a process of argument defendants have claimed the trial court found the option void for lack of mutuality. This contention constitutes a distortion of the findings of fact and conclusions of law, which must be construed together. Defendants in their answer had pleaded that they had performed under the agreement, that plaintiffs had committed a breach, which excused defendants from further performance. The conclusion of the trial court was a response to this answer, namely, that so long as the option remained unaccepted, it was a unilateral writing lacking the mutual elements of a contract, and that there must be an acceptance by the optionee, before an executory contract, binding on the parties, can arise.[2]

Defendants contend that the trial court erred in concluding that more than a reasonable time had elapsed between December 1969 and April 1973, the time plaintiffs revoked their offer. Defendants urge that as a matter of law the option had not expired prior to May 24, 1973, the day Johnson tendered $21,000.

Where an agreement is silent as to the time in which an optionee is required to exercise his option, the law requires the party to act within a reasonable

1. *Cummings v. England*, 12 Utah 2d 69, 73, 362 P.2d 584 (1961).

2. 1 Williston On Contracts (3d Ed.), Sec. 61B, p. 200.

time. What is deemed a reasonable time is ordinarily a question of fact under all the circumstances.[3] However, by its very nature, an option is an instrument as to which time is of the essence.[4]

Plaintiff George Catmull testified that he thought the option would last only six or eight months, particularly, he didn't think a ten dollar deposit would make it last any longer. The conceded purpose of the amendment was to assist Johnson in obtaining financing; which, according to his representations, had been impossible while there was a royalty agreement on the Free Coinage Claims. When Johnson obtained financing, the purpose for the amendment ceased. There was no evidence to sustain Johnson's position that he could slowly accumulate the earnings from the operation of the lift, without paying royalties, then exercise the option after he had acquired sufficient funds. The trial court was further impressed by the change of circumstances, in the interim; from the time the option was executed until the attempted exercise by the optionee. The purchase price was calculated on the basis of a representation, by Johnson, that the royalty would never exceed $100 per month. After construction and operation of the lift revealed the inaccuracy of this estimation, defendants attempted to exercise the option.

A review of the record discloses sufficient facts to sustain the determination of the trial court that the option was not exercised within a reasonable time.

Defendants further contend that the trial court erred in the determination that the 1969 amendment was unenforceable, since plaintiffs had failed to fulfill their obligation to demand payment of the $21,000 purchase price and thereby place defendants in default. Defendants urge the rule that when the time for the performance of a contract is indefinite, a party desiring no longer to be bound by the contract must place the other party in default by demanding the contractual performance and allowing the other party a reasonable opportunity thereafter to perform.

This argument misconstrues the nature of an option agreement. An option to purchase or to sell is not a contract to purchase or sell. The optionee has the right to accept or to reject the offer, in accordance with its terms; the optionee is not bound, and has discretion in regard to the action he will take under the option.[5] An optionee, prior to acceptance, cannot be placed in default by the optionor demanding performance, because the optionee is not contractually bound to perform any duty. The rule cited by defendants applies to bilateral contracts, wherein a party who has a valid and binding obligation to perform cannot be defaulted prior to the other party's demand for performance.

Finally, defendants contend that the trial court erred in its determination that the Forest Service formula was a reasonable method to calculate the gross receipts attributable to the Gad II ski lift. Plaintiffs are entitled under the royalty agreement to receive a minimum of two per cent of the gross receipts attributable to Gad II. Defendants operate five ski lifts and there is no separate pass sold for Gad II.

The United States Forest Service has granted a special use permit to defendants for the use of land within the Snowbird resort. The fee charged under this permit is calculated by multiplying the total passenger capacity of all the ski lifts by the total slope distances of all the lifts. The percentage of this product, which crosses Forest Service land, is the figure against

3. *Cummings v. Nielson*, 42 Utah 157, 168, 129 P. 619 (1912).

4. 6 Williston On Contracts (3d Ed.), Sec. 853, pp. 211–213; *Ensign v. Bohn*, 1 Ariz. App. 386, 403 P.2d 321, 323 (1965).

5. 1 Williston On Contracts (3d Ed.), Secs. 61A & 61B, pp. 198–202.

which the Forest Service applies its two per cent permit fee.

The passenger capacity and slope distance are the operative factors in the Forest Service formula to evaluate the revenue generating power of a lift facility. Under this method approximately 24.09 per cent of the receipts for ski passes are attributable to Gad II. There is an alternative formula to test ski lift utilization which involves multiplying the passenger capacity by the vertical rise (this is the distance from bottom to top in elevation). Under this formula 21.45 per cent of the ski gross receipts are attributable to Gad II. There was also evidence which indicated that a formula using the actual traffic multiplied by the slope length attributed 23.15 per cent of the receipts to Gad II.

Defendants offered the testimony of an employee of Snowbird as an expert witness. He testified that from his on-the-site observations Gad II only generated 5 to 7 per cent of the total receipts. He explained that Gad II was situated in a remote area far from the parking lots and traversed difficult terrain where only experts would ski. He testified that the area was hazardous and was the last to open and first to close. The Gad II lift was difficult to service and maintain and was therefore operated less frequently. The expert did admit that the percentage using the Gad II had increased in the past two years.

Defendants offered a three-factor formula which they urged would be more in accord with the observations of their expert. The three factors are capacity per hour, cable slope distance, and vertical rise. Under this formula 15.9 per cent of the revenue is attributable to the gross receipts of Gad II. Plaintiffs urged that this formula was devised by defendants and was unique. Defendants' expert admitted that their exhibit illustrating this formula was the only example of its use in evidence, and that he had never observed this manner of calculation being utilized. Plaintiffs contended that the use of both the

vertical rise and cable slope distances represented the use of the same factor twice. Such is necessarily so for the hypotenuse (slope distance) includes the altitude (the vertical rise) of the triangle.

All parties admit that the revenue attributable to Gad II cannot be determined with exactitude; that the various formulas are calculations utilizing factors, which give weight to the differences in length and carrying capacity of the different lifts. There is sufficient evidence in the record to sustain the determination of the trial court. The judgment of the trial court is affirmed.

HENRIOD, C. J., and ELLETT, CROCKETT and TUCKETT, JJ., concur.